**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Onofre Lopez, | ) | CASE NO. 1:13 CV 1930 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Cleveland, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

**<u>Introduction</u>**

This matter is before the Court upon Defendants Officers' Motion for Summary

Judgement (Doc. 49) and Motion for Summary Judgment of Defendant City of Cleveland

(Doc. 48).  This is a civil rights dispute.  For the following reasons, the motions are

GRANTED.

**<u>Facts</u>**

Plaintiff, Onofre Lopez, brings this action as the Administrator of the Estate of

Illuminado Lopez ("Lopez") against defendants the City of Cleveland ("City") and several of

1

its police officers, Amy Carraway ("Carraway"),[1] Donato Daugenti ("Daugenti"), Amy

Milner ("Milner"), David Schramm ("Schramm"), and Michael Tankersley ("Tankersley")

(collectively "defendant officers").   This case arises from the shooting death of Lopez by

defendant officers.

The complaint contains six claims for relief.  Count One is a Section 1983 claim

against the individual officers for excessive force.  Count Two is a claim for "governmental

liability" against the City.  Count Three asserts gross negligence and assault and battery

against the individual officers.  Count Four is a claim for negligent and/or intentional

infliction of emotional distress against all defendants.  Counts Five and Six assert claims

against all defendants for wrongful death and "survival action," respectively.  On December

13, 2013, this Court dismissed Counts Four, Five, and Six against the City, leaving the rest of

the Complaint pending.

The matter is now before the Court upon the City and defendant officers' respective

motions for summary judgment, which plaintiff opposes.  The following facts are presented to

the Court.

During the evening of July 29, 2011, Lopez was visiting his sisters, Adelaida Pla

("Adelaida") and Melba Cartagena ("Melba"), who lived two houses from each other on West

52nd Street in Cleveland, Ohio.  Maria Cruz ("Cruz"), a friend of Lopez's, lived in the house

between the sisters.  While at Melba's, Lopez got into a verbal altercation with his nephew,

Samuel Cartagena ("Samuel"), and "said some violent stuff." (Samuel Depo. 16).  When

---

[1]     Carraway's last name is now Harper.  The Court refers to her as "Carraway" in
the opinion.  However, where her deposition is cited it is referred to as "Harper
Depo."

Melba attempted to intervene, Lopez responded by grabbing a baseball bat from Cruz's car and breaking the windows in Samuel's car.  Melba then called the police. (Samuel Depo. 18-19).

Officers Schramm and Milner arrived about 15 minutes later, responding to a call that an individual was threatening a family member and had a baseball bat. (Milner Depo. 21). When Schramm and Milner pulled up, they found Lopez sitting cross-legged in the middle of the street with a beer bottle. (Adelaida Depo. 26-27).  Believing that Lopez was likely under the influence of alcohol, the officers approached, drew their tasers, and ordered Lopez to get out of the street with his hands up.

As Lopez stood up, Schramm and Milner observed that he had a machete in his hand. (Schramm Depo. 23; Milner Depo. 28-31).  They ordered him to drop it and when he failed to comply, Milner tased him. (Milner Depo. 28-30).  The taser, however, did not have an effect on Lopez, who used the machete to sever the taser's wires. (Adelaida Depo. 43; Noel Depo. 13-14; Melba Depo. 23-24).  The officers dropped their tasers and drew their firearms. (Milner Depo. 32, 39; Schramm Depo. 42, 46).

Schramm and Milner then called for backup. (Daugenti Depo. 15-16).  Daugenti, Carraway, Tankersly, and two other officers soon arrived on the scene.  After repeatedly ordering Lopez to put down the machete, Daugenti and Carraway tased him for a second and third time. (Schramm Depo. 67; Milner Depo. 37, 64-65; Daugenti Depo. 33; Harper Depo. 44).  Lopez again used the machete to cut away the taser cords. (Tankersley Depo. 57; Noel Depo. 29).  Lopez then walked from the street onto the sidewalk in front of Cruz's house. The police formed a tactical semi-circle in the street about 15 to 20 feet from Lopez as he

stood on the sidewalk facing them. (Schramm Depo. 82, 91; Satish Depo. 37).  By then, a crowd had gathered at the scene and both the police and bystanders shouted at Lopez to drop the machete. (Adelaida Depo. 41; Schramm Depo. 59; Noel Depo. 17).  From this moment on, the facts are in some dispute.

### A. Defendants' Witnesses

Tankersley states that Lopez had the machete raised above his head when an unidentified woman began running towards Lopez.  As she was running, Lopez "made a gesture, which would have been to his right, toward her with it like he was swinging it at her." (Tankersley Depo. 53, 73-74).  Tankersley then opened fire.

Daugenti states that Lopez was facing forward when he first raised the machete. (Daugenti Depo. 38).  According to Daugenti, a woman then began running on the sidewalk to Lopez's right. Lopez never made any movement toward the woman, but he turned in her direction with the machete still above his head. (Daugenti Depo. 38-40).  Daugenti then opened fire at Lopez.

Carraway states that a woman was running to Lopez's right. (Harper Depo. 60). Lopez then "turned to his right and then lifted the machete over his head, and [the woman] was still running at him." (Harper Depo. 62).  At that point, Carraway discharged her weapon. (Harper Depo. 65).

According to Milner, a woman got to within five feet of Lopez. (Milner Depo. 68). Lopez then raised the machete over his head and turned to his right towards the woman. (Milner Depo. 68, 73).  Milner began shooting.

Schramm states that as a woman ran towards Lopez, he "picked the machete up over

his head and turned towards her." (Schramm Depo. 85).  According to Schramm, Lopez

"turned the upper part of his body towards" the woman at which point Schramm began to fire.

(Schramm Depo. 92).

Cruz remembers Lopez walking back and forth in front of her house with the machete.

(Cruz Decl. ¶¶ 7, 8).  When the police told him to put down the machete, Lopez said they

would have to take it. (Cruz Decl. ¶ 8).  Cruz states that Lopez lifted the machete over his

head and when he dropped it down halfway toward his body, the police shot him. (Cruz Decl.

¶ 12).  The police fired their shots right in a row. (Cruz Decl. ¶ 14).

**B. Plaintiff's Witnesses**

Adelaida, who was standing in her yard to Lopez's right, states that when he first

reached the sidewalk, she tried to approach him and asked him to drop the machete. (Adelaida

Depo. 40).  As she did this, she continuously identified herself to the police as his sister, told

the officers that he was "sick," and pleaded with them not to shoot him. (Adelaida Depo. 44).

Adelaida grew tired of shouting to the police and began to walk towards her house. (Adelaida

Depo. 44-45).  When Adelaida reached the steps of her porch, she states that Lopez called her

by name and asked her to take the machete from him. (Adelaida Depo. 45).  Adelaida then

walked towards Lopez, shouting to the police not to shoot him and assuring them that she

would get the machete from him. (Adelaida Depo. 45-46).  Adelaida stood about seven feet

from Lopez and asked him to walk to her to give her the machete. (Adelaida Depo. 53).

Lopez began to turn to his right in Adelaida's direction with the machete down at his side

when the police began to fire. (Adelaida Depo. 46, 49-50).  The first bullet struck Lopez in

the shoulder and he immediately fell to the ground. (Adelaida Depo. 46).  Adelaida states that

she watched the officers shoot Lopez two more times when he was on the ground. (Adelaida Depo. 53-55).

According to Satish Concepcion ("Satish"), who watched events unfold from Adelaida's yard, Lopez was pacing back and forth on the sidewalk.  While there, Lopez told the police they were going to have to kill him before they could take the machete.  (Satish Depo. 23).  Eventually, Adelaida began approaching Lopez. (Satish Depo. 44-45).  Satish heard Adelaida tell the police that Lopez was her brother and that she would be able to get the machete from him. (Satish Depo. at 44).  Lopez and Adelaida began walking towards each other and Satish believed that Lopez was going to give Adelaida the machete, which he never raised above his head. (Satish Depo. 44-45).  When Adelaida and Lopez were about the "width of a house" apart or "just a couple of feet away," the officers then began shooting at Lopez. (Satish Depo. 44-45, 69).

Noel Cartagena ("Noel"), Melba's son, who watched events unfold from his mother's front yard, states that Adelaida was standing close to the police and asking them not to shoot her brother. (Noel Depo. 15).  Adelaida tried to get closer to Lopez, telling him to drop the machete.  As Adelaida approached, Noel heard Lopez say to the police "if you guys don't shoot me, I'm going to stab myself." (Noel Depo. 15).  He then raised the machete over his head as if he was going to stab himself. (Noel Depo. 15).  Lopez was facing straight ahead when the police opened fire. (Noel Depo. 16).

Melba, who was standing in the front yard of her house, saw Adelaida trying to get closer to Lopez, but Adelaida was being restrained by a police officer. (Melba Depo. 27).  From her yard, Melba heard Adelaida tell the police "don't shoot my little brother" and "I'm

6

going to go to my brother and to take the machete from him." (Melba Depo. 27).  Adelaida broke away from the officer to get closer to Lopez.  He raised the machete as if he was going to stab himself. (Melba Depo. 31).  Lopez then turned to his left, in Melba's direction, and asked her "this is the way you want me to die?" (Melba Depo. 31).  The police then began to shoot Lopez when he was turned to his left looking at Melba.  As he fell to the ground, Lopez dropped the machete. (Melba Depo. 35).  The police continued to shoot Lopez after he fell to the ground. (Melba Depo. 33, 35).

### C. Expert Opinions

Defendant officers fired eight shots in total. (Timm Decl. ¶ 11).  Carraway fired twice, Milner once, Schramm once, Daugenti twice, and Tankersley twice.  Three bullets hit Lopez. (Doc. 52-2 p. 2-3; Timm Decl. ¶ 13).  One in his left shoulder, one to his right front thigh, and one in his back. (Timm Decl. ¶ 13).  Subsequent ballistics testing indicates that the shot to Lopez's left shoulder was fired from Schramm's service weapon. (Timm Decl. ¶ 17).  The origin of the other two bullets was unascertainable. (Timm Decl. ¶ 18).

The pathologist who performed the autopsy made the following observations with regards to the gunshot wound to Lopez's back.  First, Dr. Pekarski noted that "there is a black powder within the abraded margin." (Doc. 52-2 p. 2).  Also noted were "multiple red abrasions[,]" or scrape wounds, in the area surrounding the bullet wound to Lopez's back. (*Id*.).  "There was a "3'' x 2'' red pink abraded contusion medially." (Doc. 52-2 p. 2).  Dr. Pekarski also noted that "[a] fragment of gray metal is embedded in one of the abrasions[.]" (*Id*.).

Plaintiff's forensic pathologist, Werner Spitz, M.D., opined on each of the bullet

7

wounds based on his examination of photographs of the wounds, Dr. Pekarski's autopsy report, and the deposition testimony of several witnesses.  As to the shoulder wound, Dr. Spitz indicated that the "shot was fired straight on and horizontally from the front." (Doc. 42 p. 5).  Dr. Spitz opined that "[t]his shot by its configuration and the location does not support that Mr. Lopez had his arms stretched out above his head or that he was turned to his right walking toward his sister." (Doc. 42 p. 5).  Dr. Spitz reached a similar conclusion regarding the bullet wound to Lopez's leg. Dr. Spitz observed that "[t]he shot [to Lopez's leg] is almost horizontal and fired straight from the front." (Doc. 42 p. 5).

Additionally, Dr. Spitz opined "there is a reasonable degree of certainty" that the shot to the back was a contact shot. (Spitz Depo. 60-66).  Dr. Spitz noted Dr. Pekarski's autopsy report, in which she described a "black powder" within the bullet wound. (Spitz Depo. 60). According to Dr. Spitz, the presence of soot inside a bullet wound is indicative of a "contact shot," where the tip of the barrel made contact with the skin at the time of discharged. (Spitz Depo. 64-65).  Dr. Spitz described a possible alternative scenario where Lopez was lying on his right side on the sidewalk when he was shot in the back. (Spitz Depo. 66, 69-80).  Under this scenario, defendant officers shot Lopez after he fell to the ground and was incapacitated, and a bullet ricocheted off the sidewalk cement and hit his back. (Spitz Depo. 66, 69-80).

### Standard of Review

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

8

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

9

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is

"merely colorable" and not "significantly probative," the court may decide the legal issue and

grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Analysis**

**A. 1983 Claim (Count One)**

Defendant officers argue that they are entitled to qualified immunity with regard to the

§ 1983 claim because their conduct was objectively reasonable and did not violate clearly

established law.

Qualified immunity protects a government official from liability for damages if the

official's conduct in performing a discretionary function does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known. *Pearson v.*

*Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009); *Schreiber v. Moe*, 596

F.3d 323, 329 (6th Cir. 2010).  Qualified immunity is immunity from suit rather than a mere

defense to liability, and "applies regardless of whether the government official's error is 'a

mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"

*Pearson*, 129 S.Ct. at 818 (citing *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284, 157

L.Ed.2d 1068 (2004)).  It "gives ample room for mistaken judgments by protecting all but the

plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*,

585 F.3d 901, 907 (6th Cir. 2009) (citing *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534,

116 L.Ed.2d 589 (1991) (internal quotations omitted)).  The plaintiff bears the burden of

showing that the defendant is not entitled to qualified immunity. *Id.*  To determine whether a

government official is protected by qualified immunity, a court must determine whether the

10

plaintiff has shown facts that constitute the violation of a constitutional right, and whether

that right was clearly established in the context of the case. *Pearson*, 129 S.Ct. at 818 (citing

*Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).  In a deadly

force case, the plaintiff "must show that the right was clearly established in a 'particularized

sense,' such that a reasonable officer confronted with the same situation would have known

that using deadly force would violate that right." *Chappell,* 585 F.3d at 907 (*quoting Brosseau*

*v. Haugen,* 543 U.S. 194, 199–200, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).

      This Court must first determine whether a constitutional violation occurred.  Because

plaintiff brings a claim for excessive force, this Court applies a Fourth Amendment analysis.

*Henderson v. Reyda*, 192 Fed. Appx. 392 (6th Cir. 2006) (*citing Graham v. Connor*, 490 U.S.

386, 395 (1989)) ("[A]ll claims that law enforcement officers have used excessive force-

deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]").

      The Fourth Amendment prohibits the use of excessive force by arresting and

investigating officers. *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006).  To determine

whether a constitutional violation based on excessive force has occurred, courts apply an

"objective-reasonableness standard, which depends on the facts and circumstances of each

case viewed from the perspective of a reasonable officer on the scene and not with 20/20

hindsight." *Binay v. Bettendorf,* 601 F.3d 640, 647 (6th Cir. 2010) (*citations omitted*). "The

calculus of reasonableness [regarding an officer's use of force] must embody allowance for

the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that

is necessary in a particular situation." *Id., citing Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Relevant considerations to be taken into account in determining whether a use of force was reasonable and not excessive include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  This standard contemplates "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer,* 310 F.3d 937, 944 (6th Cir. 2002).

The Sixth Circuit applies a time-segmented analysis to excessive force claims. *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007).  In other words, a court should identify the seizure and determine whether the force used during the seizure was reasonable under the totality of the circumstances. *Id.*  A court should not consider whether it was reasonable for officers to create the circumstances leading to the seizure. *Id.* (*citing Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).  A court must instead "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force." *Id.* (*citing Dickerson*, 101 F.3d at 1162).

Defendant officers argue that they were faced with a rapidly evolving and potentially dangerous situation.  They maintain that the facts show that Lopez had a machete in his hand, he ignored police and family requests to drop the machete, and he made a movement towards a woman who was within several feet of him and approaching him on the sidewalk.  Any factual differences between defendant officers' accounts and other witnesses are minor and immaterial.  Under these circumstances, defendant officers argue, their use of deadly force

was reasonable.

Plaintiff contends that it is impossible to determine whether defendant officers acted reasonably under the circumstances when it is unclear what those circumstances were. Plaintiff maintains that there are facts in dispute about whether Lopez really posed a threat to Adelaida when the police shot him. For instance, the witnesses do not agree on whether or not Lopez had the machete raised above his head when Adelaida approached or whether it was at his side. Nor do they agree whether Lopez turned towards Adelaida or towards Melba who stood in the opposite direction from Adelaida. Other witnesses perceived Lopez to be a threat to himself and not to Adelaida. Plaintiff argues that defendant officers are not entitled to summary judgment on their qualified immunity claim because resolution of these factual disputes is critical to determining defendant officers' liability.

After review, the Court finds that there is no issue of material fact as to whether excessive force was used. Construing the evidence in a light most favorable to the plaintiff, Lopez presented an imminent threat of serious harm to someone. It is not disputed that the police were on the scene to respond to a call that Lopez was in a fight with his family and had a baseball bat, which he had used to smash the windows of his nephew's car. When the first officers arrived, they found Lopez in the street with a machete which he refused to put down. Attempting to use non-lethal force, Milner tased Lopez, apparently unsuccessfully. Lopez then used the machete to sever the taser's wires. When more officers arrived, he ignored the officers' repeated orders and the pleas of his family to put down the machete. He continued to resist arrest by severing the wires of two more tasers that the police used in an attempt to subdue him.

13

According to Adelaida, Lopez turned to his right in Adelaida's direction with the machete down at his side, while Satish states that Lopez was walking toward Adelaida and never raised the machete.  Noel testified that Lopez was facing straight forward with the machete raised over his head.  Melba testified that Lopez raised the machete as if to stab himself and then turned to the left in Melba's direction.

While the exact distance is in dispute, all the witnesses appear to agree that Lopez was in close proximity to Adelaida when the police fired.  Adelaida states she was seven feet from Lopez. (Adelaida Depo. 46).  Noel testified it was five or six feet. (Noel Depo. 41).  Melba remembers that Adelaida "tried to be so close – almost close to him" when the police fired. (Melba Depo. 32).  Satish testified that Adelaida and Lopez were the "width of a house" or " a couple of feet away" from each other, close enough that defendant officers "could have shot [Adelaida]" when they fired at Lopez. (Satish Depo. 40, 69).

Under all of these scenarios, the officers' decisions to fire were objectively reasonable.  The Court is not persuaded by the cases cited by plaintiff.  In *Scozzari v. Miedzianowski*, 454 Fed. Appx. 455 (6th Cir. 2012), there were factual disputes about whether Scozzri had a hatchet above his head when he was shot and whether he was menacing an officer who had tripped on the ground. *Id*. at 458.  But moreover, there was a factual dispute about whether Scozzari actually had any weapons at the time he was shot or whether they were placed at the scene by the police. *Id*. at 463.   In *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006), there was a factual dispute about whether the officer ran after a fleeing suspect who was shot in the back or whether the suspect swerved his car in the officer's direction. *Id*. at 535-36.

14

Here, there is no dispute that Lopez was resisting arrest, ignored the police orders and repeated pleas of his family to drop the machete, had used the machete to sever the taser wires, was holding the machete at the time of the shooting, and made some movement when he was shot.  There is also no dispute that Adelaida was in close proximity.  In this type of rapidly developing situation, defendant officers "need not have taken [the] chance and hoped for the best" that Lopez would not harm Adelaida or another bystander. *Scott v. Harris,* 550 U.S. 372, 385, 127 S.Ct. 1769, 1778, 167 L.Ed.2d 686 (2007).  In light of Lopez's earlier refusals to drop the machete, any potential movement by him, whether or not directed at himself or Adelaida, could reasonably be viewed as requiring the use of deadly force. *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998) (finding officers entitled to qualified immunity where suspect was recently armed and was coming towards officers); *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir. 1991) (per curium) (officer's use of deadly force was objectively reasonable where machete wielding suspect refused requests to drop machete and advanced on officers); *Woodward v. Town of Battleboro*, No. Civ. 1:02 CV 35, 2006 WL 36906 (D. Vt. Jan. 5, 2006) (finding speculation that suspect was moving to take his own life did not preclude summary judgment for defendant officers where suspect had refused to drop his weapon and made some kind of movement).  Lopez may not have intended to harm Adelaida, another bystander, or even himself that night, but qualified immunity does not require police officers to plumb the depths of a suspect's mind.  Rather, it requires the police to reasonably react to a threat, which defendant officers did.  As such, defendant officers are entitled to qualified immunity.

The Court also agrees that defendants are entitled to summary judgment on plaintiff's

15

excessive force claim to the extent that it is premised on the police continuing to shoot Lopez when he fell to the ground. There is no evidence that there was any lag between the first and last shots fired. (Martinelli Report 22; Cruz Decl. ¶ 14). Plaintiff's own witnesses agree that the shots happened in a split second. (Satish Depo. 46). Even if defendant officers continued to fire at Lopez when he was on the ground, "it is clear from the very brief time that elapsed that [defendant officers] made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation." *Berube v. Conley,* 506 F.3d 79, 85 (1st Cir. 2007). Defendant officers' actions were not unreasonable because they may have failed to perfectly coordinate the reaction of five separate individuals within a few seconds to respond to Lopez's threat. *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1230 (9th Cir. 2014) (finding officer who may have fired at suspect on the ground was entitled to qualified immunity where all her shots were fired in a brief amount of time). Plaintiff fails to present any authority holding that the use of deadly force in these circumstances is excessive. Summary judgment for defendant officers on this point is granted.

The Court also agrees that defendant officers are entitled to summary judgement on plaintiff's claim for excessive force on a theory that defendant officers delivered a contact shot to Lopez's back. Plaintiff points to Dr. Spitz's determination that the bullet to Lopez's back was a contact shot and this creates a genuine factual dispute about whether defendant officers used excessive force. The Court disagrees. Neither Melba nor Adelaida, the two witnesses that saw defendant officers shoot at Lopez while he was on the ground, recount that the police moved from their positions in the street to fire on Lopez at close range. (Adealida Depo. 86-87) (Q. "[A]fter Lopez had been shot that first time, did you see any of the police

16

officers get closer to him in order to shoot him again?" A. "No."). The record instead

demonstrates that defendant officers fired at Lopez from their position 15 to 20 feet away

from him in a rapid succession. (Martinelli Report 22; Adelaida 87; Cruz Decl. ¶ 14). The

Court's duty to view the facts in the light most favorable to the nonmovant does not require or

permit the Court to accept mere allegations that are not supported by factual evidence.

*Chappell v. City of Cleveland,* 585 F.3d 901, 906 (6th Cir. 2009) (internal citation omitted).

Here, there is no testimony from any witnesses that supports Dr. Spitz's opinion.

Consequently, the Court finds that there is no material dispute about whether defendant

officers used excessive force by firing at Lopez at close range on the ground.

For the reasons discussed above, defendant officers are entitled to summary judgment

that their seizure of Lopez did not violate the Fourth Amendment. Absent a Fourth

Amendment violation, the Court need not inquire into whether the right was clearly

established. *Cherrington v. Skeeter*, 344 F.3d 631, 636 (6th Cir. 2003). Plaintiff's § 1983

claim fails.

**B. State Law Claims (Counts Three, Four, Five and Six)**

Plaintiff also alleges state law claims for gross negligence and assault and battery,

negligent and/or intentional infliction of emotional distress, and wrongful death and a survival

action. Plaintiff asserts that defendant officers are not immune because a jury could find their

conduct willful, wanton, and reckless given their ineffective use of tasers, handling of a

situation involving an unstable suspect, and decision to discharge their firearms under

improper circumstances.

Ohio Revised Code § 2744.03 states, in relevant part:

17

(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
...
(B) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
...
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner

The Court's determination that defendant officers did not act with excessive force "necessarily forecloses the argument" that they acted in a willful, wanton, or reckless manner. *See Cabaniss v. City of Riverside*, 231 Fed. Appx. 407, 418 (6th Cir. 2007). Thus, defendant officers are entitled to immunity from plaintiff's state law claims pursuant to § 2744.03.

### C. City's Motion for Summary Judgment

Plaintiff seeks to hold the City liable because it failed to adequately train defendant officers and it ratified their conduct through its investigation.

A municipality cannot be found liable for deprivation of a constitutional right unless a plaintiff can establish that an officially executed policy or the toleration of a custom within the municipality deprived the plaintiff of that right. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, in order to hold a municipality liable, the plaintiff must establish that: (1) a constitutional violation occurred, and (2) the county is responsible for the violation. *Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

18

Having found that defendant officers did not violate Lopez's Fourth Amendment rights, summary judgment in favor of the City is appropriate. *See Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992) (dismissing claims against a city and police chief in light of summary judgment in favor of the officer).

**Conclusion**

Plaintiff has failed to establish a Fourth Amendment violation.  Consequently, for the reasons set forth above, Defendants Officers' Motion for Summary Judgement (Doc. 49) and Motion for Summary Judgment of Defendant City of Cleveland (Doc. 48) are GRANTED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 11/24/14

19